# UNITED STATES DISTRICT COURT
### FOR THE
### EASTERN DISTRICT OF KENTUCKY

### LEXINGTON DIVISION

| | |
|---|---|
| **NICHOLAS P. CHRISTOPHER**<br><br>*Plaintiff,*<br><br>v.<br><br>**LEXINGTON-FAYETTE URBAN COUNTY GOVERNMENT**, and **DAVID S. BIROSCHIK**, in both his individual and official capacities,<br><br>*Defendants*. | Case No. _____<br><br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Comes Plaintiff, Nicholas P. Christopher ("***Christopher***"), through undersigned counsel, and for his Complaint and Demand for Jury Trial against Defendants, Lexington-Fayette Urban County Government ("***LFUCG***") and David S. Biroschik ("***Biroschik***"), in both his individual and official capacities, states as follows:

## PARTIES

1.     Christopher is a natural person and resident of Madison County, Kentucky.

2.     LFUCG is a political subdivision of the Commonwealth of Kentucky.

3.     LFUCG operates the Lexington Police Department ("***LPD***").

4.     Biroschik is a natural person and resident of Fayette County, Kentucky.

5.     Biroschik is employed by LFUCG.

6.     Biroschik holds the rank of commander at LPD.

7.     Christopher seeks a final judgment against Biroschik in his individual capacity.

8.     Christopher seeks a final judgment against Biroschik in his official capacity with LFUCG.

1

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this civil action by virtue of 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

10.     This Court has supplemental jurisdiction over this civil action by virtue of 28 U.S.C. § 1367(a).

11.     This Court is the proper venue for this civil action under 28 U.S.C. § 1391(b)(2) because LFUCG and Biroschik reside in this judicial district, and "a substantial part of the events or omissions giving rise to the claim occurred" in this judicial district.

## FACTUAL ALLEGATIONS

12.     Christopher is a decorated veteran of the United States Army.

13.     Before hiring Christopher as a sworn officer, LPD conducted a formal background investigation and suitability screening that documented multiple independent references describing Christopher as calm, level-headed, empathetic, and professional in high-stress situations, and as ethical and honest even when honesty carried adverse consequences. The background report for Christopher is marked **Exhibit 1** to this Complaint and incorporated herein by this reference.

14.     On October 23, 2023, LFUCG hired Christopher, and he joined LPD.

15.     On May 6, 2024, Christopher graduated from the training academy and earned the rank of police officer with LPD.

16.     On September 9, 2024, Christopher performed a lawful use of force on a criminal suspect, Gary Mundy ("*Mundy*"), at the Kroger on Richmond Road in Lexington, Kentucky (the "*Kroger Incident*"). Christopher acted in the scope of his official duties, and consistent with his training and experience in law enforcement.

2

17. The use of force complied with state and federal law, and the policies and procedures of LPD.

18. Christopher effectuated a lawful arrest of Mundy.

19. Christopher charged Mundy with one count of menacing, one count of criminal trespassing, and one count of resisting arrest. The uniform citation stated:

> [Mundy] was seen by employees inside the Kroger at 3101 Richmond Rd. [Mundy] has been told that he is not allowed on the premises in the past. [Mundy] was observed by Kroger employees and heard by dispatch threatening to physically assault the loss prevention employee at Kroger. [Mundy] attempted to prevent his arrest by a peace officer, recognized to be acting under color of his official authority.

The citation is marked **Exhibit 2** to this Complaint and incorporated herein by this reference.

20. Mundy has several prior convictions for shoplifting at Kroger stores in Lexington, Kentucky, and he has been ordered to stay out of all Kroger, Walmart, and Kmart stores.

21. The same day, Christopher submitted a case report for the Kroger Incident. The next day, on September 10, 2024, Sergeant James McCullough ("*Sgt. McCullough*") approved the case report. The report explained:

> I gave [Mundy] several more orders to exit the vehicle and each time he refused. I then attempted to pull [Mundy] out of the vehicle, but he defensively resisted by pulling his arms away from me and retreating further into the seat. Not knowing if there were any weapons in the vehicle and not wanting to get dragged into the vehicle, I drew my taser and once again instructed [Mundy] to exit the vehicle or he would be tased. After refusing multiple times, I deployed my taser and it was effective. [Mundy] then exited the vehicle and I placed him in handcuffs.

The case report is marked **Exhibit 3** to this Complaint and incorporated herein by this reference.

22. On September 9, 2024, LPD also opened a "Response to Resistance," or so-called "Blue Team" report for the Kroger Incident.

23. On September 12, 2024, LPD transferred Christopher to one of the most severe administrative assignments, *i.e.*, Level 3B, without any notice or justification for the personnel

3

action. LFUCG barred him from "the exercise of police authority," prohibited him from "carrying any concealed deadly weapon at any time," revoked his "take home vehicle privilege," banned him from "working or engaging in any off-duty employment," ordered him "to turn in all department owned weapons, equipment, and official credentials," and forbid him from "wear[ing] a department uniform or any clothing displaying the department badge or insignia." The personnel order is marked **Exhibit 4** to this Complaint and incorporated herein by this reference.

24.    On September 13, 2024, Sergeant Scott Evely ("*Sgt. Evely*") submitted a memorandum for the "Blue Team" report. The memorandum stated:

> I watched the BWC for [Christopher], along with reading his memorandum. ... [Christopher] had Probable Cause for Menacing at the time of the incident, and ordered the suspect out of the vehicle nine times before attempting soft empty hand control to remove him from the vehicle. The suspect displayed defensive resistance and pulled away from [Christopher]. [Christopher] then attempted "painting" with his Taser and ordered the suspect again, but he did not exit the vehicle. Due to probable cause existing for Menacing, and lesser levels of force being ineffective, I believe the use of the Taser was objectively reasonable.

The memorandum is marked **Exhibit 5** to this Complaint and incorporated herein by this reference.

25.    On September 16, 2024, four days after LFUCG placed Christopher in the "Level 3B" assignment, Commander Tommy Perkins ("*Cmdr. Perkins*") sent an email to Biroschik, the commander in charge of the Public Integrity Unit ("*PIU*"), on behalf of Chief Lawrence Weathers ("*Chief Weathers*"). The email read, "Chief Weathers has authorized an Inquiry into the arrest of [Mundy] at the Kroger on Richmond Road...." The email is marked **Exhibit 6** to this Complaint and incorporated herein by this reference.

26.    The next day, on September 17, 2024, Biroschik launched a calculated, deceitful, and malicious campaign to remove Christopher from LPD, to ruin his career in law enforcement, and to destroy his personal reputation in the community.

27.     Biroschik immediately breached the parameters of the narrow "inquiry" related to the Kroger Incident, and he set out to find any possible infraction by Christopher, no matter how trivial, in the course of his brief employment with LPD. Biroschik has admitted that he reviewed approximately 90-95% of Christopher's "solo-phase" body-worn camera ("**BWC**") footage, and that he then identified a list of incidents he "had issues with," reflecting an expansive search for allegations beyond the narrow "inquiry" authorized by Chief Weathers. (Biroschik Dep. Tr. 14:1-9).[1] His review spanned "close to 100" videos of separate law enforcement interactions where Christopher activated his BWC.

28.     On September 17, 2024, Biroschik sent an email to the lieutenant in charge of the Planning and Analysis Unit at LPD. The email read, "Is it possible that I could get a list of all of the arrest[s] made by [Christopher] since August 19, 2024? I have an Inquiry that I am working and I need to look at a few things with them." The email is marked **Exhibit 7** to this Complaint and incorporated herein by this reference.

29.     On September 19, 2024, Commander Chris Cooper ("**Cmdr. Cooper**"), the supervisor in charge of the Bureau of Training and Wellness, sent an email to Assistant Chief Roger Holland ("**A.C. Holland**"). The email noted, "Just an update on [Christopher]... [Biroschik] came by today to collect any information we had on him for the inquiry he is completing for Chief." The email is marked **Exhibit 8** to this Complaint and incorporated herein by this reference.

30.     Biroschik later testified that he orally briefed Assistant Chief Brian Maynard ("**A.C. Maynard**") about his "concerns" discovered in the "inquiry," yet he has not produced any written memorandum or communications to document or memorialize those briefings. (Biroschik Dep. Tr. 60:13-25) (testifying he had "discussions with Chief Maynard" but had no writings to him).

---

[1] On December 29, 2025, Christopher, through counsel, obtained the deposition of Biroschik in his civil action related to his open records request described in numerical paragraph 64 of this Complaint.

5

31. Biroschik advanced stigmatizing conclusions without any documented evidence trails.

32. On October 11, 2024, LFUCG terminated Christopher from LPD.

33. The same day, Chief Weathers executed a personnel order related to Christopher. The order stated, "This is to advise on the termination of [Christopher] to be effective today, October 11, 2024." The personnel order is marked **Exhibit 9** to this Complaint and incorporated herein by this reference.

34. Biroschik later admitted that he was not involved in the drafting of the personnel order, and that he had no communications with Chief Weathers or other command staff about the drafting of the personnel order. (Biroschik Dep. Tr. 54:5-15). The reason was because no documented investigative basis for the misconduct or termination existed at that time.

35. LFUCG did not provide Christopher with any written factual basis for his termination.

36. The same day, Cmdr. Cooper sent an email to A.C. Holland. He inquired whether command staff had any desire to report Christopher to the Kentucky Law Enforcement Council ("***KLEC***"). The email read, in part, "[C]an you advise if there was any inclination to de-certify [Christopher]." The email is marked **Exhibit 10** to this Complaint and incorporated herein by this reference.

37. KLEC oversees the training and certification of peace officers in Kentucky.

38. All peace officers must have a certification from KLEC to exercise law enforcement powers in the state.

39. KLEC may revoke the certification of a peace officer if the officer is terminated for "professional malfeasance or professional nonfeasance by his or her agency." KRS § 15.391(3)(a).

40.     Biroschik could not identify a date when he "completed" the "inquiry," and he conceded that he had not finished the summary by the time he notified KLEC of the termination. (Biroschik Dep. Tr. 60:1-25) (investigation "completed," but summary not finished; no completion date provided).

41.     When pressed on how Chief Weathers "had all the information" to support a termination decision, Biroschik testified that he did not necessarily speak to Chief Weathers directly, and that he could not "pin it down." (Biroschik Dep. Tr. 167:1-168:7) (uncertain whether he spoke to Chief Weathers; remembers speaking to A.C. Maynard).

42.     LFUCG intentionally advanced the "inquiry" via conversations, instead of formal documentation, and command staff intentionally ignored their own policies and procedures related to the conduct of investigations. The asserted "basis" for termination and the report to KLEC was not documented in accordance with the policies and procedures of LPD.

43.     On or about October 12, 2024, the day after Chief Weathers discharged Christopher from LPD, Commander Brian Peterson ("**Cmdr. Peterson**") sent an email to Sgt. Evely, at the behest of Biroschik, and instructed Sgt. Evely to change his memorandum in the "Blue Team" report for the Kroger Incident. Cmdr. Peterson directed, "I would also consider removing your determination that the Taser use was reasonable, since it was not given the overall situation and since the officer created the situation that ultimately required a Taser to be used." The email is marked **Exhibit 11** to this Complaint and incorporated herein by this reference.

44.     Upon information and belief, Biroschik used his position of authority to perpetuate a false narrative of misconduct related to the Kroger Incident.

45.     The chain of custody log for the "Blue Team" report indicates that, in the five days after Chief Weathers terminated Christopher from LPD, command staff forced at least two different

7

supervisors to revise or modify their initial memorandums to conform with the false narrative of misconduct. The chain of custody log is marked **Exhibit 12** to this Complaint and incorporated herein by this reference.

46. On October 15, 2024, Christopher received a letter from Chief Weathers. The letter informed Christopher that LFUCG had reported his termination to the Kentucky Law Enforcement Council ("***KLEC***"). The letter explained, "Per KRS 15.391, notification was sent to [KLEC] that you were terminated from [LPD] pursuant to an investigative inquiry for violation of General Order 1973-02K Disciplinary Procedures of Sworn Officers, Appendix B, 1.02 Misconduct. Further questions should be forwarded to the KLEC Administrative Office." The letter is marked **Exhibit 13** to this Complaint and incorporated herein by this reference.

47. LFUCG did not charge Christopher with misconduct before it terminated him from LPD.

48. On October 17, 2024, six days after Chief Weathers fired Christopher, Biroschik delivered a memorandum entitled "investigative notes" to Chief Weathers. The memorandum offered a summary of his findings related to the Kroger Incident. The memorandum alleged:

> It is my opinion in this case that [Christopher] was overly emotional and hostile to [Mundy]. At the time of first contact [Christopher] did not have valid charges and no reason he could not have slowed the sense down while waiting for additional officers. It is also my opinion that the charges placed were incorrect and only placed after he had deployed his taser prior to arresting him.

Biroschik also provided a summary of his findings related to another incident at the Walgreens on Polo Club Lane in Lexington, Kentucky (the "***Walgreens Incident***"). He then admitted that he reviewed nearly all of the BWC footage for Christopher. The memorandum states, "Based on these two incidents and now having concerns with [Christopher's] actions, I decided to review the vast majority of BWC Footage from all of the incidents he had been involved in since being released

8

on his own." Biroschik concluded, "After reviewing these complaints and other incidents that were discovered it is my opinion that if [Christopher] were not still on probation a Formal Complaint would be recommended for Misconduct or Unsatisfactory Performance."  His findings and conclusions in the "investigative notes" were entirely subjective, unsubstantiated, and made with reckless disregard for standard investigative procedures. The memorandum is marked **Exhibit 14** to this Complaint and incorporated herein by this reference.

49.     Biroschik later admitted that there were significant defects in evidence preservation and investigative file completeness. He testified that he supposedly reviewed computer-aided dispatch records, but they are "not in [his] investigative file at all." (Biroschik Dep. Tr. 152:5-153:13). Biroschik conceded that he did not obtain or review the taser data for the Kroger Incident, even though the use of force was the purported reason for the "inquiry" and later justification for his ultimate determination of misconduct. (Biroschik Dep. Tr. 160:1-21) (testifying he did not ask for and never saw taser information).

50.     Biroschik later testified that he never read the "Blue Team" reports which contain all of the witness statements, memorandums, and other evidence associated with a use of force or similar significant event. (Biroschik Dep. Tr. 161:16-164:5) (not recalling review of "Blue Team" reports); (Biroschik Dep. Tr. 175:1-176:6) (testifying he never read "Blue Team" reports for Christopher).

51.     Upon information and belief, like the Kroger Incident, Biroschik used his position of authority to perpetuate a false narrative of misconduct related to the Walgreens Incident.

52.     The chain of custody log for the "Blue Team" report related to the Walgreens Incident suggests that, in the three days after Chief Weathers terminated Christopher from LPD,

command staff instructed at least two different supervisors to change their initial memorandums to conform with the false narrative of misconduct.

53.   On or about October 23, 2024, Biroschik submitted a "Separation Details" form to KLEC. The form alleged that Christopher was terminated for misconduct, and that LPD had already completed its administrative investigation "at the time of [his] departure." The form stated, "Allegation from Complainant of [Christopher] used excessive force while falsely placing them under arrest. An inquiry investigation confirmed several of the allegations and possible violations of policies and regulations." The form is marked **Exhibit 15** to this Complaint and incorporated herein by this reference.

54.   On October 28, 2024, seventeen days after Chief Weathers terminated Christopher, and five days after Biroschik submitted the "Separation Details" form to KLEC, Biroschik delivered a formal summary of the "inquiry" to Chief Weathers. The summary asserted:

> After reviewing these incidents and interviewing [Christopher] it is my opinion that if he were not still on probation moving forward with a Formal Complaint would be appropriate. This recommendation is due to the fact that it appears that he has potentially violated department policies and regulations. ... Based on the fact he is no longer employed by [LPD] I would recommend this Inquiry be closed.

His findings and conclusions in the formal summary, like the "investigative notes," were entirely subjective, unsubstantiated, and made with reckless disregard for standard investigative procedures. The summary is marked **Exhibit 16** to this Complaint and incorporated herein by this reference.

55.   On October 30, 2024, Tom Mattingly ("*Mattingly*"), an investigator with KLEC, sent an email to Biroschik. Mattingly explained that he was assigned to review the "circumstances surrounding the separation of [Christopher]" from LPD. He requested "any investigative materials [LPD] possesses relative to the circumstances surrounding [Christopher's] separation, to include

10

any investigative materials and all pertinent complaints, any related correspondence/memoranda[,] orders[,] and/or [n]otices, interviews, and any pertinent audio/video evidence." The email is marked **Exhibit 17** to this Complaint and incorporated herein by this reference.

56.     Upon information and belief, Biroschik selectively produced a limited number of materials from the "inquiry" to safeguard and propagate his false narrative of misconduct against Christopher.

57.     On November 1, 2024, Mattingly sent a follow-up email to Biroschik. Mattingly confirmed that he spoke with Biroschik by telephone. He also noted the unusual nature of this "inquiry" based on his past experience with LPD. The email stated:

> [T]hanks for discussing the matter with me - I apologize for inundating you with emails this morning, but [LPD] has always produced some of the most comprehensive IA investigations that [KLEC] receives in these KRS 15.391 cases, so I was surprised when there was limited documentation in this case; however, it makes complete sense now that you've walked me through everything, and I appreciate your insight and patience!"

The email is marked **Exhibit 18** to this Complaint and incorporated herein by this reference.

58.     Upon information and belief, Biroschik told Mattingly that Christopher was unfit for a career in law enforcement, and that he should not have the right or ability to exercise law enforcement powers by virtue of his certification.

59.     Upon information and belief, Biroschik failed to inform Mattingly that, in the week after Chief Weathers discharged Christopher from LPD, he orchestrated an effort to revise several memorandums in the "Blue Team" reports for the Kroger Incident and the Walgreens Incident.

60.     Upon information and belief, Biroschik failed to inform Mattingly that he did not finalize the "inquiry" until seventeen days after Chief Weathers terminated Christopher from LPD.

61.     Upon information and belief, Biroschik failed to inform Mattingly that he did not finalize the "inquiry" until five days after he submitted the "Separation Details" form to KLEC.

11

62.     On November 11, 2024, Christopher, through counsel, sent a letter to Biroschik. Christopher requested a copy of "all investigative materials" related to his termination from LPD. He also questioned the factual grounds for his termination. The letter read, in part:

> Since LPD's initial separation notice to [Christopher] did not provide any specific reasons or grounds for his termination, the subsequent KLEC notice was unexpected. [Christopher] was not given an opportunity to respond to accusations of policy violations or alleged misconduct. ... [I]f LPD has compiled written findings or similar reports alleging misconduct, this could pose serious issues and potentially infringe upon his constitutional rights. Without access to LPD records, we cannot fully assess these concerns; however, Chief Weathers' KLEC notification suggests that unrebutted statements may adversely affect [Christopher's] professional reputation and could impose a stigma that limits his ability to pursue future employment opportunities.

The letter is marked **Exhibit 19** to this Complaint and incorporated herein by this reference.

63.     The same day, Biroschik responded, "Your request has been forwarded to the law department for review.  If you have any questions I have been advised they would need to be made through them.  The records requested will also need to be requested by an Official Open Records Request."

64.     LFUCG did not supply Christopher with any investigative materials related to his termination or offer any further explanation of the factual basis for his termination.

65.     On November 18, 2024, Christopher submitted a "formal" request for public records from LPD. The open records request called for, *inter alia*, "[c]opies of all records related to any internal or external complaints, notifications, or reports regarding" the Kroger Incident, "[c]opies of all investigative reports and/or internal memoranda concerning... LPD's termination of [Christopher]," and "[c]opies of any written or electronic records... regarding [Christopher] between LPD... and [KLEC]." The request is marked **Exhibit 20** to this Complaint and incorporated herein by this reference.

12

66.     On December 4, 2024, Christopher received an initial response to the open records request. The initial response alleged, "A review of records maintained in [PIU] finds they possess 1 informal complaint and no formal complaints regarding [Christopher]." The initial response is marked **Exhibit 21** to this Complaint and incorporated herein by this reference.

67.     LFUCG outright denied the vast majority of the open records request in blatant violation of state law. LFUCG produced a total of four emails.

68.     Biroschik later testified that he searched his Outlook email account, and that he only found an email "from you [counsel for Christopher] to me to Chief Maynard" and "no e-mails to anyone else in the department" related to the "inquiry" for Christopher. (Biroschik Dep. Tr. 72:1-19). This admission reinforces that his "investigation" was conducted in a manner to avoid internal documentation, and to facilitate the *post hoc* creation of his false narrative of misconduct.

69.     On December 16, 2024,  Christopher, through counsel, sent a letter to Mayor Linda Gorton ("*Mayor Gorton*"). He demanded a name-clearing hearing to confront the allegations of misconduct and defend his personal and professional reputation. The letter noted that Christopher has "limited information" about the factual basis for his termination, "including the origin and details of the complaint that initiated it," and that he "vehemently denies the serious allegations that he engaged in official misconduct related to his job performance." The letter further stated:

> The actions and assertions of Chief Weathers and/or [LPD] have caused significant harm to [Christopher's] reputation, good name, professional standing, and integrity. The stigmatizing nature of these false allegations has long-term, adverse consequences for his further employment prospects and his position in the community." As such, [Christopher] formally demands a name-clearing hearing before the City Council....

The letter is marked **Exhibit 22** to this Complaint and incorporated herein by this reference.

70.     On January 24, 2025, over a month after Christopher requested a name-clearing hearing from LFUCG, he received a response from Hon. Carlos A. Ross ("***Ross***"), counsel for LFUCG. The response alleged:

> Chief Weathers initiated an Inquiry after he received a formal complaint that [Christopher] used excessive force to arrest an individual on September 9, 2024, at Kroger on Richmond Road... An informal complaint was made against Officer Christopher for an incident that occurred on September 2, 2024. ... Based on the two initial incidents, the PIU investigator reviewed the majority of [Christopher's] solo phase body-worn camera (BWC) footage. This review let to discovering an incident that involved [Christopher's] interaction with juveniles at the Roots and Heritage Festival.

The letter further claimed, "[Christopher] as a nontenured employee was provided an opportunity to clear his name before being terminated. ... [Christopher] was afforded an opportunity to clear his name before Chief Weathers and therefore, your request for a hearing before the City Council is denied." The response is marked **Exhibit 23** to this Complaint and incorporated herein by this reference.

71.     LFUCG confirmed the existence of at least one formal complaint, one informal complaint, and one other formal or informal complaint against Christopher.

72.     LFUCG alleged that Christopher had a sufficient opportunity to clear his name at his investigatory interview with Biroschik and his private meeting with Chief Weathers, when he first learned of his termination.

73.     Christopher was not aware of the formal or informal complaints or the allegations of misconduct at the time of his investigatory interview with Biroschik or his private meeting with Chief Weathers.

74.     On February 25, 2025, Christopher, through counsel, sent a lengthy, follow-up letter to LFUCG in reference to the open records request. The follow-up letter confronted the obvious

14

discrepancies between the initial response to the open records request from LFUCG, and the letter

from Ross, almost two months later. The follow-up letter stated:

> When [Christopher] submitted the [open records request], he asked for all "personnel records" from his employment with LPD, "internal or external complaints" related to the Kroger Incident, and "investigative reports and/or internal memoranda" related to... his termination from LPD. On December 4, 2024, [LFUCG] responded, "A review of records maintained in [PIU] finds they possess 1 informal complaint and no formal complaints regarding [Christopher]. This representation was incorrect. On January 24, 2025, we received a letter from [Ross], counsel for LFUCG.... In short, the [l]etter confirms the existence of at least one (1) formal complaint, one (1) informal complaint, and (1) other formal or informal complaint against [Christopher].

Christopher reiterated his demand for, *inter alia*, "a copy of all formal and informal complaints

referenced" in the letter from Ross, "a copy of all internal or external complaints, notifications, or

reports related to the Kroger Incident," and "a copy of all investigative reports and/or internal

memoranda related to" his termination from LPD. The follow-up letter is marked **Exhibit 24** to

this Complaint and incorporated herein by this reference.

75.     LFUCG intentionally refused to furnish Christopher with a substantial number of

public records associated with the Kroger Incident and his termination from LPD. However, On

March 26, 2025, after receiving an open-records request and follow-up inquiry from WLEX-TV

regarding "former Officer Nicholas Christopher terminated in October of 2024 while under an

internal inquiry into a tasing incident at the Richmond Rd Kroger," Cmdr. Perkins drafted and

circulated an official response for approval. The email is marked **Exhibit 25** to this Complaint and

incorporated herein by this reference.

76.     Cmdr. Perkins reported internally that he "spoke with Chief," and that command

staff was "good" to use the prepared statement confirming Christopher's probationary termination

and the KLEC notification.

77.     In its written response to WLEX-TV's open records request (OR-25-0813), LPD affirmatively represented that PIU possessed "1 informal complaint, no formal complaints, and 1 internal inquiry regarding Nicholas Christopher," and further asserted that "documentation regarding internal inquiries which are open for public inspection include the communication from the Chief to PIU initiating the inquiry, documentation reviewed by the Chief in determining final action, and documentation representing the final action of the agency." The email is marked **Exhibit 26** to this Complaint and incorporated herein by this reference.

78.     While LPD publicly confirmed that Christopher was terminated while under an internal inquiry and provided selected "final action" documents in response to media open records requests, LPD simultaneously invoked open records exemptions to withhold the underlying investigative drafts, notes, and preliminary memoranda that would permit Christopher to meaningfully understand, rebut, and clear his name of the stigmatizing accusations.

79.     Approximately six months after Christopher's termination, KLEC advised LPD personnel that the records supplied to KLEC contained inconsistent separation information, including a report that Christopher "resigned" before the PIU investigation was complete while the LETRS entry reflected "terminated," requiring KLEC to seek clarification to ensure its decertification summary was accurate. The email is marked **Exhibit 27** to this Complaint and incorporated herein by this reference.

80.     On April 22, 2025, Biroschik responded to those questions and advised Mattingly in writing that "Officer Christopher was terminated on October 11, 2024 during a meeting with Chief Weathers," and that "[t]here was no summary written up by the Chief." The email is marked **Exhibit 28** to this Complaint and incorporated herein by this reference.

16

81.     In the same communication, Biroschik represented to KLEC that "there was no 'Red Book' because [the matter] never moved to a Formal," confirming that PIU did not treat this as a formal administrative investigation despite the city's later "misconduct" reporting to KLEC and the severe decertification consequences that followed.

82.     On July 22, 2025, Christopher initiated a civil action in the Fayette Circuit Court under the Kentucky Open Records Act ("*KORA*"), *i.e.*, KRS § 61.870, *et seq.*, to obtain all of the public records associated with the Kroger Incident, the Walgreens Incident, and his termination from LPD.

83.     On August 27, 2025, Christopher received a letter from KLEC dated August 12, 2025. KLEC notified Christopher that, in light of the allegations from LPD, it had decided to take action to revoke his peace officer certification.

> [KLEC] was notified of circumstances affecting your peace officer certification status. Specifically, [KLEC] was presented with information indicating that your certification may be revoked pursuant to KRS 15.391. ... This letter is sent to notify you of [KLEC's] determination to initiate the proceedings to revoke your peace officer certification pursuant to KRS 15.391 and KRS Chapter 13B.

The letter is marked **Exhibit 29** to this Complaint and incorporated herein by this reference.

84.     On or about September 16, and September 18, 2025, Biroschik attended multiple in-service, annual training sessions attended by all of the sergeants and lieutenants at LPD. In each training session, there were approximately 30-50 employees from across the entire department.

85.     At each of these training sessions, Biroschik made public remarks to the lieutenants and sergeants about recent internal investigations conducted by PIU, and specifically about the last five investigations where officers resigned before termination or were fired by the department.

86.     This characterization included Christopher, and employees of LPD believed that his remarks concerned Chirstopher.

17

87. Biroschik stated that these five officers had lied in the course of their PIU investigations, and that all of these former officers were forced to resign or were fired for dishonesty instead of, or together with, other allegations of misconduct.

88. Biroschik confirmed that he publicly aired this dishonesty narrative at these training sessions:

```
Q.   [Y]ou conducted or addressed training sessions for...
     the lieutenants and  sergeants   over   the   summer,
     correct?
A.   Correct.
Q.   These were... on-duty departmental trainings with these
     officers?
A.   Sergeant and lieutenants, yes.
Q.   They were not private meetings. They were... public
     meetings?
A.   Correct. ...
Q.   At those sessions you stated, unprompted as I understand
     it, that the last five LPD terminations involving
     officers [who] were represented by the same FOP law firm
     involved... officers being told to lie during their PIU
     investigations by their legal counsel or they lied
     during their interviews.
A.   (Moved head up and down).
Q.   You said those things, correct? ...
A.   I don't recall exactly what I said. It was in the
     neighborhood of that.
```

89. Critically, when pressed, Biroschik testified under oath that he is not aware of any evidence that Christopher lied, deceived, or misrepresented anything at any time in his "inquiry." (Biroschik Dep. Tr. 213:19-214:4).

90. When confronted about the false and defamatory statements and the stigma and harm to Christopher, Biroschik first tried to deny his statements, but then agreed that he would "publicly clear [Christopher's] name" if attendees believed that he was referring to Christopher. (Biroschik Dep. Tr. 214:8-24).

91. Biroschik has not taken any steps to publicly clear Christopher's name since his deposition.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF 42 U.S.C. § 1983**

92.    Christopher restates and reiterates each of the foregoing averments.

93.    The Due Process Clause of the Fourteenth Amendment to the Constitution of the United States proclaims, "No State shall... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

94.    Christopher has a liberty interest in his reputation, good name, honor, and integrity.

95.    The stigmatizing misconduct, dishonesty, and unfitness statements damaged Christopher's reputation and employability precisely because they contradicted his documented military service, work history, and professional endorsements.

96.    LFUCG violated the Due Process Clause of the Fourteenth Amendment when Chief Weathers fired Christopher from LPD, and then Chief Weathers and Biroschik stigmatized him by the voluntary, public dissemination of false information.

97.    LFUCG violated the Due Process Clause of the Fourteenth Amendment when Christopher requested a name-clearing hearing before the Urban-County Council to address the public dissemination of false information, but Mayor Gorton, through counsel, rejected his lawful demand for a name-clearing hearing.

98.    LFUCG and its elected and nonelected officials and employees acted under the color of law.

99.    Biroschik acted under the color of law.

100.   LFUCG terminated Christopher without justification.

19

101.    LFUCG stigmatized Christopher when it voluntarily published and disseminated false and defamatory information related to the Kroger Incident, the Walgreens Incident, and his termination from LPD.

102.    LFUCG represented that Christopher had violated state and federal law, and that he had infringed upon the civil rights of Mundy.

103.    LFUCG represented that Christopher was unfit for a career in law enforcement.

104.    These statements accused Christopher of criminal activity, injured his professional standing, and challenged his ability to serve in law enforcement.

105.    These statements were false.

106.    LFUCG voluntarily published and disseminated these statements to employees of LPD, members, employees, and agents of KLEC, news media outlets, and the general public.

107.    LFUCG voluntarily published and disseminated these statements in public records subject to KORA.

108.    LFUCG, through the Office of the Chief and with Chief Weathers' approval, publicly confirmed to WLEX-TV through official open records communications that Christopher was terminated while under an internal inquiry and that notice was sent to KLEC, and LFUCG provided copies of the inquiry file to WLEX-TV, thereby disseminating stigmatizing information to the public and prospective law enforcement employers.

109.    Biroschik stigmatized Christopher when he voluntarily published and disseminated false and defamatory information related to the Kroger Incident, the Walgreens Incident, and his termination from LPD.

110.    Biroschik represented that Christopher had violated state and federal law, and that he had infringed upon the civil rights of Mundy.

20

111.    Biroschik represented that Christopher was unfit for a career in law enforcement.

112.    Biroschik represented that Christopher was dishonest.

113.    These statements associated Christopher with dishonesty, accused him of criminal activity, injured his professional standing, and challenged his ability to serve in law enforcement.

114.    Biroschik voluntarily published and disseminated these statements to employees of LPD, members, employees, and agents of KLEC, news media outlets, and the general public.

115.    Biroschik voluntarily published and disseminated these statements in public records subject to KORA.

116.    Christopher requested a name-clearing hearing before the Urban-County Council.

117.    LFUCG refused to provide Christopher with any sort of name-clearing hearing.

118.    LFUCG is liable for the unlawful conduct of Mayor Gorton, Chief Weathers, Biroschik, and command staff at LPD.

119.    LFUCG has an official policy, practice, and custom of intentional stigmatization of former officers, without due process of law, in violation of their rights under the Due Process Clause of the Fourteenth Amendment.

120.    LFUCG and its elected and nonelected officials and employees acted under this official policy of stigmatization with respect to Christopher when they voluntarily disseminated false information related to the Kroger Incident, the Walgreens Incident, and his termination from LPD.

121.    LFUCG and its elected and nonelected officials and employees acted under this official policy of stigmatization with respect to Christopher when, after Chief Weathers terminated him from LPD, Biroschik and command staff revised and modified the "Blue Team" reports and

21

perpetuated a false narrative of misconduct to ruin his career in law enforcement and destroy his personal reputation in the community.

122. Mayor Gorton and Chief Weathers have final policymaking authority for LFUCG and LPD.

123. LFUCG and its final policymakers ratified the conduct of Biroschik and command staff at LPD.

124. Christopher has suffered actual damages and economic loss because of the unlawful conduct of LFUCG and Biroschik.

**COUNT II**
**DEFAMATION**

125. Christopher restates and reiterates each of the foregoing averments.

126. Biroschik intentionally defamed Christopher when he created a false narrative related to the Kroger Incident and the Walgreens Incident and then perpetuated his false narrative across the entire department. Biroschik stated that Christopher had violated state and federal law, and that he had infringed upon the civil rights of Mundy. He also stated that, based on the Kroger Incident and the Walgreens Incident, Christopher was unfit for a career in law enforcement.

127. Biroschik intentionally published these statements to individuals within LPD, including the supervisors referenced in the "Blue Team" reports.

128. These statements were false.

129. Biroschik knew that each of these statements were false.

130. These statements were libelous and slanderous *per se*; they impugned Christopher with criminal activity, injured his professional standing, and challenged his ability to serve in law enforcement.

22

131.    Biroschik acted without any legitimate claim of privilege when he published these statements to individuals within LPD, including the supervisors referenced in the "Blue Team" reports.

132.    Biroschik acted with actual malice toward Christopher. Biroschik was determined to remove him from LPD, to ruin his career in law enforcement, and to destroy his personal reputation in the community.

133.    Biroschik memorialized a set of stigmatizing allegations in his "investigative notes" dated October 17, 2024, and those misconduct allegations, including a use of excessive force and false arrest, were forwarded to KLEC and were referenced in LPD's public open records responses and press materials. Biroschik told KLEC that LPD had already completed its administrative investigation "at the time of [his] departure." But Biroschik admitted under oath that he had no Chief-prepared summary, no formal "Red Book," and that PIU closed the inquiry because Christopher had separated from LPD -- all factors that demonstrate the absence of any meaningful documented process and the lack of a contemporaneous official factual record supporting the stigmatizing charges.

134.    KLEC expressly advised Biroschik that statutory immunity for KLEC investigative disclosures does not apply where the information is "knowingly false or deliberately misleading," is "rendered with malicious purpose," or is "in violation of any civil right of the former employee."

135.    Notwithstanding those warnings, Biroschik intentionally published these misleading claims and statements to the members, employees, and agents of KLEC to trigger decertification.

136.    These statements were false.

137.    Biroschik knew that each of these statements were false.

23

138. These statements were libelous *per se*; they impugned Christopher with criminal activity, injured his professional standing, and challenged his ability to serve in law enforcement.

139. Biroschik acted without any legitimate claim of privilege when he published these statements to the members, employees, and agents of KLEC. These statements were knowingly false and deliberately misleading, and they were delivered to KLEC for a malicious purpose.

140. Biroschik acted with actual malice toward Christopher. Biroschik was determined to remove him from LPD, to ruin his career in law enforcement, and to destroy his personal reputation in the community.

141. Upon information and belief, Biroschik intentionally defamed Christopher when he spoke with Mattingly, the investigator from KLEC. Upon information and belief, Biroschik stated that Christopher was unsuitable for a career in law enforcement, and that he should not have the right or ability to exercise law enforcement powers by virtue of his certification.

142. Biroschik intentionally published these statements to Mattingly.

143. These statements were false.

144. Biroschik knew that each of these statements were false.

145. Biroschik's statements directly contradicted LPD's own documented assessment of Christopher's professional and personal reputation for honesty and integrity.

146. These statements were slanderous *per se*; they impugned Christopher with criminal activity, injured his professional standing, and challenged his ability to serve in law enforcement.

147. Biroschik acted without any legitimate claim of privilege when he published these statements to Mattingly. These statements were knowingly false and deliberately misleading, and they were delivered to KLEC for a malicious purpose.

24

148.    Biroschik acted with actual malice toward Christopher. Biroschik was determined to remove him from LPD, to ruin his career in law enforcement, and to destroy his personal reputation in the community.

149.    Biroschik intentionally defamed Christopher at multiple, public training sessions attended by all of the sergeants and lieutenants at LPD. Biroschik stated that Christopher had lied in the course of his "inquiry," and that he was terminated for dishonesty.

150.    Biroschik intentionally published these statements to all of the supervisors at LPD.

151.    These statements were false.

152.    Biroschik knew that each of these statements were false.

153.    These statements were slanderous *per se*; they accused Christopher of dishonesty, injured his professional standing, and challenged his ability to serve in law enforcement.

154.    Biroschik acted without any legitimate claim of privilege when he published these statements to the sergeants and lieutenants at LPD.

155.    Biroschik acted with actual malice toward Christopher. Biroschik was determined to remove him from LPD, to ruin his career in law enforcement, and to destroy his personal reputation in the community.

156.    Christopher has suffered actual damages and economic loss because of the unlawful conduct of Biroschik.

### COUNT III
### PUNITIVE DAMAGES

157.    Christopher restates and reiterates each of the foregoing averments.

158.    Biroschik acted with gross negligence, oppression, fraud, malice, and common law bad faith, with willful, wanton, and reckless disregard for the rights of Christopher.

25

159.    This Court should enter an award of exemplary and punitive damages against Biroschik.

## PRAYER FOR RELIEF

**WHEREFORE**, Christopher respectfully prays for the following relief:

1.    A final judgment against LFUCG and Biroschik, jointly and severally, for the full extent of all damages established by the evidence at trial;

2.    A final order instructing LFUCG to convene a public, name-clearing hearing before the Urban-County Council;

3.    An award of exemplary and punitive damages;

4.    An award of pre- and post-judgment interest at the prevailing rate from the date of injury until the date of judgment, and from the date of judgment until the date of satisfaction of the judgment in full;

5.    An award of court costs, expenses, and reasonable attorney's fees;

6.    A trial by jury on all issues so triable; and

7.    All further relief to which Christopher may appear entitled by law or equity, including, without limitation, the right to amend this Complaint.

Respectfully submitted,

**CROSBIE EATON OLESON PLLC**

*/s/ Scott A. Crosbie*

_____
Scott A. Crosbie
Nicholas A. Oleson
201 East Main Street, Suite 800
Lexington, Kentucky 40507
Telephone: (859) 287-2400
scrosbie@ceo-lawyers.com
noleson@ceo-lawyers.com
*Counsel for Plaintiff*

26